1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

# UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF WASHINGTON
# AT SEATTLE

CLIMATE SOLUTIONS, SIERRA CLUB,
NATURAL RESOURCES DEFENSE COUNCIL,

*Plaintiffs,*

v.

U.S. DEPARTMENT OF
TRANSPORTATION,

SEAN DUFFY, in his official capacity as
Secretary of the U.S. Department of
Transportation,

FEDERAL HIGHWAY ADMINISTRATION, and

SEAN MCMASTER, in his official capacity as
Administrator of the Federal Highway
Administration,

*Defendants.*

Civil Action No.
_____

**COMPLAINT OF PUBLIC
INTEREST
ORGANIZATIONS**

COMPLAINT OF
PUBLIC INTEREST ORGANIZATIONS
CASE NO. _____

- 1 -

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

**INTRODUCTION**

1.    This suit challenges Defendants' unlawful actions to indefinitely freeze billions of dollars that Congress appropriated for the Charging and Fueling Infrastructure ("CFI") Program, which provides funding for vehicle charging and alternative vehicle fueling infrastructure.

2.    Congress established the CFI Program under "Subtitle D-Climate Change," Section 11401, of the 2021 Infrastructure Investment and Jobs Act ("IIJA"), appropriating $2.5 billion in order to "support changes in the transportation sector that help achieve a reduction in greenhouse gas emissions and improve [] mobility" by "strategically deploy[ing] publicly accessible electric vehicle charging infrastructure, hydrogen fueling infrastructure, propane fueling infrastructure, and natural gas fueling infrastructure" Pub. L. No. 117–58, Section 11401; *see also* 23 U.S.C. § 151(a) (same).

3.    Despite Congress appropriating funds for the CFI Program, and despite the U.S. Department of Transportation ("USDOT") and Federal Highway Administration ("FHWA") having awarded hundreds of millions of dollars' worth of grants under the program, Defendants have, since January 20, 2025, refused to award new grants, refused to execute new grant contracts with previously announced awardees, refused to enter into new obligations under existing grants, or remit additional funds under the program beyond previously obligated funds, leaving the CFI Program frozen and the vast majority of money Congress appropriated for the program blocked or impounded. Meanwhile, with each passing year, another Fiscal Year of unobligated CFI funds expires.

4.    Defendants' indefinite freeze of the CFI Program is unlawful. By refusing to implement the CFI Program, and by blocking the distribution of funds in contravention of congressional directives, Defendants have violated the Administrative Procedure Act ("APA"),

COMPLAINT OF
PUBLIC INTEREST ORGANIZATIONS
CASE NO. _____

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

the constitutional separation of powers, the Executive Branch's duty to faithfully execute the laws, and have acted *ultra vires*.

5.      Plaintiffs are nonprofit membership organizations whose members would benefit from the buildout of electric vehicle charging infrastructure that Congress intended the CFI program to provide, and are harmed by the Defendant's unlawful refusal to implement the CFI Program that would otherwise fund the buildout of the charging infrastructure that Plaintiffs' members would use and that would also reduce harmful air pollution that impacts Plaintiffs' members.

6.      To prevent further harm, Plaintiffs seek vacatur of Defendants' unlawful actions, as well as declaratory and injunctive relief to end the unlawful freeze and compel Defendants' compliance with congressional directives.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under federal law, specifically, the United States Constitution and the Administrative Procedure Act, 5 U.S.C. § 551 et seq., and federal common law. The Court has further remedial authority under the Declaratory Judgment Act, 28 U.S.C. §§ 2201(a) and 2202.

8.      Venue is proper in the Western District of Washington pursuant to 28 U.S.C. § 1391(e) because Plaintiff Climate Solutions is headquartered in this district and a substantial part of the events or omissions giving rise to the claim occurred in this district.

COMPLAINT OF
PUBLIC INTEREST ORGANIZATIONS
CASE NO. _____

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

1

**PARTIES**

2

<u>Plaintiffs</u>

3        9.        Climate Solutions is a regional 501(c)(3) non-profit organization, headquartered

4    in Seattle, Washington with satellite offices in Olympia, Washington and Portland, Oregon.

5    Climate Solutions is focused on creating a thriving, equitable Northwest, powered by clean

6    energy, inspiring the transition to sustainable prosperity across the nation and beyond. Its

7    mission is to accelerate clean energy solutions to the climate crisis. As a Northwest-based clean

8    energy economy nonprofit, Climate Solutions works to: (1) champion transformational policies

9    and market-based innovations; (2) catalyze powerful partnerships and a diverse movement for

10    action and accountability; and (3) communicate a bold vision for solutions at scale required by

11    climate science. Climate Solutions is funded entirely through charitable contributions from

12    supporters, donors, and volunteers, who include individuals, businesses, other charitable

13    organizations, and grant-making organizations. Through the support and direction of its

14    supporters, Climate Solutions has devoted considerable resources to advocating for the adoption

15    of EVs and the build-out of the EV charging network in the Pacific Northwest. It publishes

16    reports on the issue and has led advocacy in the region for widespread adoption of EVs and

17    associated charging networks. The organization's work is facilitated by contributions from its

18    supporters and work from its volunteers, who include individuals, businesses, and other

19    charitable organizations who share Climate Solutions's mission of promoting a clean energy

20    transition, including greater use of EVs. Climate Solutions' work is carried out in close

21    partnership and ongoing dialogue with its supporters and partners, with the organization holding

22    itself accountable to all of its stakeholders. Climate Solutions' financial supporters make up the

23    leadership of the organization, with its Board of Directors comprised of financial supporters.

24

COMPLAINT OF
PUBLIC INTEREST ORGANIZATIONS
CASE NO. _____

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

10.     Sierra Club is a nonprofit membership organization incorporated in California with headquarters in Oakland and over 614,000 members nationwide. Sierra Club's mission is to explore, enjoy, and protect the wild places of the earth, to practice and promote the responsible use of the earth's ecosystems and resources, to educate and enlist humanity to protect and restore the quality of the natural and human environment, and to use all lawful means to carry out these objectives. The Sierra Club is committed to protecting its members from the harms of climate change and air pollution, including pollution from the transportation sector. To that end, Sierra Club advocates to reduce harmful emissions from vehicles and to accelerate the adoption and use of zero-emission EVs. Sierra Club has specifically advocated for the deployment of electric light-, medium-duty and heavy-duty vehicles to decarbonize the U.S.'s transportation infrastructure and for the use of electric vehicles by residents of cities. This advocacy includes support for policies and programs that lower barriers to EV use by industrial, commercial, and residential users—such as improving access to reliable EV charging infrastructure. This advocacy also includes support for policies and programs that make it easier for EV use by residents of cities—such as programs that create community charging infrastructure available to the public in cities.

11.     Natural Resources Defense Council ("NRDC") is a 501(c)(3) nonprofit environmental and public health organization with several hundred thousand members. NRDC engages in research, advocacy, media, and litigation related to protecting public health and the environment. To this end, NRDC advocates for building a more resilient transportation system with zero emission vehicles to create healthier and more resilient communities, improve affordability, and generate high-quality careers. NRDC is based in New York, New York.

COMPLAINT OF
PUBLIC INTEREST ORGANIZATIONS
CASE NO. _____

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

**Defendants**

12.     Defendant Sean Duffy is the Secretary of the United States Department of Transportation. He is USDOT's highest-ranking official and is charged with supervision and management of the agency and its decisions and actions. 49 U.S.C. § 102(b). He is sued in his official capacity.

13.     Defendant USDOT is a cabinet department of the Executive Branch of the federal government.

14.     Defendant Sean McMaster is the Administrator of the Federal Highway Administration. The Administrator is responsible for carrying out the duties and powers vested in the USDOT Secretary by Chapter 4 of Title 23 of the United States Code for development related to highway design, construction, and maintenance, among other things, as well as additional duties and powers prescribed by the USDOT Secretary. 49 U.S.C. § 104(b)(1), (c). He is sued in his official capacity.

15.     Defendant FHWA is an agency administration within USDOT. 49 U.S.C. § 104(a).

**BACKGROUND**

**The Charging and Fueling Infrastructure Program**

16.     On November 15, 2021, Congress passed and President Biden signed into law the Infrastructure Investment and Jobs Act. Under "Subtitle D-Climate Change," Section 11401, of the IIJA, Congress appropriated $2.5 billion to establish the CFI Program to "strategically deploy publicly accessible electric vehicle charging infrastructure, hydrogen fueling infrastructure, propane fueling infrastructure, and natural gas fueling infrastructure." Infrastructure Investment and Jobs Act, Pub. L. 117–58, § 11401, 135 Stat. 429, 546 (2021). The express purpose of the

COMPLAINT OF
PUBLIC INTEREST ORGANIZATIONS
CASE NO. _____

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

program is to "support changes in the transportation sector that help achieve a reduction in greenhouse gas emissions and improve the mobility of passenger and commercial vehicles that employ electric, hydrogen fuel cell, propane, and natural gas fueling technologies across the United States." 23 U.S.C. § 151(a).

17.     Specifically, Congress authorized, "[t]o carry out [the CFI Program, 23 U.S.C. § 151(f)]":

(i)     $300,000,000 for fiscal year 2022;

(ii)    $400,000,000 for fiscal year 2023;

(iii)   $500,000,000 for fiscal year 2024;

(iv)    $600,000,000 for fiscal year 2025; and

(v)     $700,000,000 for fiscal year 2026.

Pub. L. 117-58, Section 11101(b)(1)(C). These funds are authorized to be appropriated out of the Highway Trust Fund. *Id.* at § 11101(b)(1). Funds that Congress appropriated for the CFI Program are available for obligation for three years after the end of the fiscal year for which they are allocated. *See* 23 U.S.C. § 118(b).

18.     Governmental or quasi-governmental entities may apply for grants to receive funding from those appropriations under the CFI Program. *See* 23 U.S.C. § 151(f)(3).

19.     A grant is "a federal financial assistance award making payment in cash or in kind for a specified purpose." U.S. Gov't Accountability Off., GAO-05-734SP, A Glossary of Terms Used in the Federal Budget Process, at 60 (Sept. 2005), https://www.gao.gov/assets/gao-05-734sp.pdf (hereinafter "Budget Glossary").

20.     An obligation is a "definite commitment that creates a legal liability of government for the payment of goods and services ordered or received, or a legal duty on the

COMPLAINT OF
PUBLIC INTEREST ORGANIZATIONS
CASE NO. _____

- 7 -

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

part of the United States that could mature into" such a liability; in contrast, an "expenditure," also known as a "disbursement," is the actual spending of federal funds. Budget Glossary at 45, 48, 70.

21.    Grant funds are provided under the CFI Program through two subprograms. The first program, known as the "Corridor" program, funds projects to, among other things, "meet current or anticipated market demands for charging or fueling infrastructure," "enable or accelerate the construction of charging or fueling infrastructure that would be unlikely to be completed without Federal assistance," and "provide access to electric vehicle charging infrastructure, hydrogen fueling infrastructure, propane fueling infrastructure, or natural gas fueling infrastructure in areas with a current or forecasted need." 23 U.S.C. § 151(f)(5)(A). The second program, known as the "Community" program, funds projects "to reduce greenhouse gas emissions and to expand or fill gaps in access to publicly accessible electric vehicle charging infrastructure, hydrogen fueling infrastructure, propane fueling infrastructure, or natural gas fueling infrastructure," prioritizing projects in "rural areas," "low- and moderate-income neighborhoods," and "communities with a low ratio of private parking spaces to households or a high ratio of multiunit dwellings to single family homes." *Id.* § 151(f)(8)(D), (F). Fifty percent of the CFI funds are reserved for the Community program. *See id.* § 151(f)(8)(A).

### Statutory Factors for CFI Grants

22.    To qualify for a grant, applicants under the Corridor program must submit "an assessment of the estimated emissions that will be reduced" by the grant. *Id.* § 151(f)(4)(B). Only applicants that submit the assessment can be considered for a grant.

23.    Similarly, grants under the Community program may only be provided for projects that are "expected to reduce greenhouse gas emissions." *Id.* § 151(f)(8)(D).

COMPLAINT OF
PUBLIC INTEREST ORGANIZATIONS
CASE NO. _____

- 8 -

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA 98104*
*(206) 343-7340*

24.     The statute lists several factors the Secretary of the Department of Transportation ("Secretary") "shall" consider when making selections for entities to receive grants under the CFI program. *Id.* § 151(f)(5). Such factors ask whether a project would:

- "improve alternative fueling corridor networks;"
- "meet current or anticipated market demands for charging or fueling infrastructure;"
- "enable or accelerate the construction of charging or fueling infrastructure that would be unlikely to be completed without Federal assistance;"
- "support a long-term competitive market for" alternative fueling systems that does not cause economic issues for existing alternative fueling infrastructure;
- provide access to alternative fueling systems "in areas with a current or forecasted need;"
- deploy alternative fueling systems "for medium- and heavy-duty vehicles;"
- ensure geographic diversity among grant recipients;
- employ private contractors that have experience installing and operating alternative fueling infrastructure and provide audited financial statements to the secretary; and
- agree to operate and maintain the alternative fueling infrastructure so it is available for use by the public and so the public or government can hold them to account if they fail to honor their commitments. *Id.*

25.     The statute allows the Secretary to additionally consider the geographic diversity of applicants and the degree to which a project "meets current or anticipated market demands for charging or fueling infrastructure, including faster charging speeds with high-powered capabilities necessary to minimize the time to charge or refuel current and anticipated vehicles." *Id.* § 151(f)(8)(G).

COMPLAINT OF
PUBLIC INTEREST ORGANIZATIONS
CASE NO. _____

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA 98104*
*(206) 343-7340*

26. These are the only factors enumerated by Congress for the Secretary to consider when allocating grants under the CFI Program.

27. Congress stated in the CFI Program statute that all projects funded by a CFI grant "shall be treated as a project on a Federal-aid highway under this chapter." *Id.* § 151(f)(9)(A).

### **The Round 1a, 1b, and 2 Grant Awards**

28. Under the Biden Administration, FHWA's process for CFI awards followed four general steps: (1) announcement of CFI grant awardees; (2) execution of grant contracts between FHWA and the awardee; (3) execution of obligations under the grant contract through serial grant contract amendments or serial project agreements for different phases of a given project; and (4) grantee submission of reimbursement requests against the obligation commitments in step (3).

29. Between the CFI Program's inception and January 2025, hundreds of entities submitted grant applications and approximately 150 grant applicants received grant awards from Defendants for their grant proposals.

30. FHWA awarded all or nearly all of the $1.8 billion of CFI grants for fiscal years 2022-2025 in three successive rounds: Round 1a (announced January 2024), Round 1b (announced August 2024), and Round 2 (announced January 2025).

31. Of these awards, most of the funds were dedicated to EV charging infrastructure.

32. In Round 1a, the program awarded $622.57 million in grants to 47 applicants across 22 States and Puerto Rico, including two Tribes. *See* FHWA, Charging and Fueling Infrastructure Program Grant Recipients, CFI Round 1A FY 2022 and 2023 Grant Award Recipients, https://www.fhwa.dot.gov/environment/cfi/grant_recipients/round_1a/; *see also* Exhibit A.

COMPLAINT OF
PUBLIC INTEREST ORGANIZATIONS
CASE NO. _____

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

33.     In Round 1b, the program awarded $521.19 million in grants to 51 applicants across 29 states and the District of Columbia, including eight Tribes. *See* FHWA, Charging and Fueling Infrastructure Program Grant Recipients, CFI Round 1B Grant Award Recipients, https://www.fhwa.dot.gov/environment/cfi/grant_recipients/round_1b/; *see also* Exhibit B.

34.     In Round 2, the program awarded $635.69 million in grants to 49 applicants across 31 states and the District of Columbia, including four Tribes.  *See* FHWA, Charging and Fueling Infrastructure Program Grant Recipients, CFI Round 2 Grant Award Recipients, https://www.fhwa.dot.gov/environment/cfi/grant_recipients/round_2/; *see also* Exhibit C.

35.     However, only a small fraction of the funding of the Round 1a, 1b, and 2 awards– roughly $215 million–was ultimately obligated by FHWA before January 20, 2025.

## **Defendants' Unlawful Freeze of the CFI Program**

36.     On January 20, 2025, President Trump signed Executive Order 14154, the "Unleashing American Energy" Executive Order ("Unleashing EO"). Exec. Order 14154, 90 Fed. Reg. 8353, 8357 (Jan. 20, 2025).

37.     Section 2 of the Unleashing EO outlined a series of broad "polic[ies] of the United States," including "eliminat[ing]" a nonexistent  "'electric vehicle (EV) mandate' . . . by considering the elimination of unfair subsidies and other ill-conceived government-imposed market distortions that favor EVs over other technologies" and "ensur[ing] that no Federal funding be employed in a manner contrary to the principles outlined in this section, unless required by law." *Id.* at 8353-54.

38.     In Section 7 of the Unleashing EO, President Trump then expressly targeted the CFI Program by directing agencies, including Defendants, to "immediately pause the disbursement of funds appropriated" through the Infrastructure Investment and Jobs Act,

COMPLAINT OF
PUBLIC INTEREST ORGANIZATIONS
CASE NO. _____

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

including "funds for electric vehicle charging stations made available through the National Electric Vehicle Infrastructure Formula Program and the Charging and Fueling Infrastructure Discretionary Grant Program." *Id.* at 8357.

39.    Through this directive, the President ordered federal agencies to withhold congressionally appropriated CFI Program funds in order to halt implementation of a statutory program based solely on policy disagreement, notwithstanding Congress's clear legislative mandate.

40.    Section 7 of the Unleashing EO also directed relevant executive agencies to "review [the] processes, policies, and programs for issuing grants, loans, contracts, or any other financial disbursements of such appropriated funds for consistency with the law and the policy outlined in section 2 of this order" relating to the CFI Program and other programs. *Id.*

41.    On January 21, 2025, the day after the Unleashing EO was issued, Acting Office of Management and Budget Director Matthew Vaeth issued a memorandum to the heads of departments and agencies stating that the Unleashing EO required them to halt disbursement of "appropriations for objectives that contravene the policies established in section 2" of the Executive Order. Office of Mgmt. & Budget, Exec. Office of the President, OMB Memorandum No. M-25-11, *Guidance Regarding Section 7 of the Executive Order Unleashing American Energy* (Jan. 21, 2025).[1]

42.    Also on January 21, 2025, Defendants sent an email to "CFI Selected Recipient[s]" postponing indefinitely the "welcome webinars scheduled for January 23, 2025, and February 6, 2025," for CFI grant awardees.

---

[1] Available at https://www.whitehouse.gov/briefings-statements/2025/01/omb-memo-m-25-11/.

COMPLAINT OF
PUBLIC INTEREST ORGANIZATIONS
CASE NO. _____

- 12 -

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

43.    On January 29, 2025, the USDOT issued a memorandum titled "Implementation of Executive Orders Addressing Energy, Climate Change, Diversity, and Gender" ("Implementation Memo"). U.S. Dep't of Transp., *Implementation of Executive Orders Addressing Energy, Climate Change, Diversity, and Gender* (2025).[2] The Implementation Memo sets out USDOT's "initial steps" to implement multiple executive orders, including the Unleashing EO, EO 14154, by ordering all USDOT operating administrations to identify everything subject to the executive orders within 10 days, and then to initiate "all lawful actions necessary to rescind, cancel, revoke, and terminate" those programs, contracts, orders, and policy documents. *Id.* at 1.

44.    During the week of March 10, 2025, the USDOT's Office of the Assistant Secretary of Transportation Policy ("OST-P") sent a guidance directive to all USDOT Operating Administrations (agencies within USDOT) and Secretarial Offices explaining USDOT policy in implementing, among other executive and secretarial orders, the Unleashing EO and the Implementation Memo. Office of the Assistant Sec'y of Transp. Policy, U.S. Dep't of Transp., *Guidance on Competitive Award Selections Made After January 20, 2021* (2025) (hereinafter "Guidance Directive") (attached hereto as Exhibit D). This Guidance Directive was not published, was not dated, and was not signed.

45.    The Guidance Directive notes that its focus is "to identify project scope and activities that are allocating funding to advance climate, equity, and other priorities counter to the Administration's Executive Orders." *Id.* at 1.

---

[2] Available at https://www.transportation.gov/sites/dot.gov/files/2025-01/Signed%20Secretarial%20Memo_%20Implementation%20of%20Executive%20Orders%20Addressing%20Energy%20Climate%20Change%20Diversity%20and%20Gender.pdf.

COMPLAINT OF
PUBLIC INTEREST ORGANIZATIONS
CASE NO. _____

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA 98104*
*(206) 343-7340*

46.     The Guidance Directive freezes all expenditures for USDOT-administered award

selections "made after January 20, 2021 that do NOT have fully obligated grant agreements or

cooperative agreements in place." *Id.* (capitalization in original). Only projects "with executed

grant agreements in place that are fully obligated" are exempted. *Id.*

47.     The Guidance Directive prescribes a series of steps for how FHWA will identify

projects deemed incompatible with the Trump Administration's policy choices.

48.     Step 1 is "program identification." It requires staff to flag programs that include

elements such as "climate change activities," or "electric vehicles (EV), and EV charging

infrastructure." *Id.* at 1-2. Step 1 further states that "project-by-project review" is required if

"[s]tatutory language includes equity requirements, [or] climate considerations", if "NOFO

mandatory evaluation criteria includes equity and/or climate requirements," or if "[e]ligible

activities included . . . EV and/or EV charging infrastructure." *Id.* at 2.

49.     Step 2 is a "project-by-project review." In this step, individual projects within a

program are examined for inclusion of Step 1 elements like "climate change activities," with

those elements then flagged "for potential removal" and escalated to leadership. Only if

leadership determines that projects do not contain any of the objectionable goals listed in Step 1

can they "[c]ontinue in their current form with no change." *Id.* at 2-3.

50.     In Step 3, award selections identified in steps 1-2 must "update project scopes to

eliminate flagged activities," and "where possible," replace those elements with elements that,

among other things, "align with . . . current Administration EOs." *Id.* at 3. Only if the awardee

agrees to remove flagged activities will DOT "proceed to grant agreement formulation and

execution." *Id.* Otherwise, DOT employees are instructed to "proceed with a reduced award that

removes the flagged scope and activities." *Id.*

COMPLAINT OF
PUBLIC INTEREST ORGANIZATIONS
CASE NO. _____

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA 98104*
*(206) 343-7340*

- 14 -

51.     Since the CFI Program was established by an act of Congress to "support changes in the transportation sector that help achieve a reduction in greenhouse gas emissions," in a Subtitle expressly named "Subtitle D-Climate Change," Pub. L. No. 117–58, Section 11401, and all grant proposals are required to provide an "assessment of the estimated emissions that will be reduced," 23 U.S.C. § 151(f)(4)(B), to be awarded a grant, pursuant to the Guidance Directive, the CFI Program would be flagged in step 1, all grant awards thereto flagged in step 2, and eliminated in step 3.

52.     The Guidance Directive notes that if "project scope elements are based in statute, program offices should consult with applicable legal counsel," then, "following legal concurrence," program offices should "raise any proposed scope changes to OA leadership." Guidance Directive at 2. However, since January 20, 2025, Defendants have ceased issuing new grant awards, executing new grant agreements, and agreeing to new obligations under prior agreements, effectively freezing the CFI Program.

53.     Instead, Defendants have claimed to CFI program participants that the CFI program is "still under administrative review," (April 24, 2025 email from Danielle King of FHWA to Rob McCracken of the City of Cincinnati), that "[w]e have not received any further guidance or information regarding the status of CFI grants or grant agreement templates" (July 14, 2025 email from Erica Tait of FHWA to Mo McReynolds of the City of Indianapolis), that "we do not have any updates on next steps" (September 5, 2025 email from Michelle Herell of FHWA to Jen Higginbotham of the Indianapolis Metropolitan Planning Organization), and that "the CFI program has not been released from administrative review to allow obligation of any CFI funding, at this time." (September 8, 2025 email from Danielle King of FHWA to Rob McCracken of the City of Cincinnati).

COMPLAINT OF
PUBLIC INTEREST ORGANIZATIONS
CASE NO. _____

- 15 -

54.    FHWA's website for the CFI Program states that "[a]ny future CFI Notice of Funding Opportunity (NOFO) will be announced on Grants.gov and this website" but that "[n]o estimated date for NOFO release is available at this time." *See* Fed. Highway Admin., Charging and Fueling Infrastructure Discretionary Grant Program (last visited December 16, 2025), https://www.fhwa.dot.gov/environment/cfi/.

## PLAINTIFFS' INJURIES

55.    Plaintiffs and their members have standing to bring this action because they are concretely injured by Defendants' unlawful actions to freeze implementation of the CFI Program, and a favorable ruling from this Court would redress those injuries.

56.    Defendants have blocked or impounded over $1.5 billion in congressionally appropriated funds under the CFI Program that would go towards electric vehicle charging infrastructure and other infrastructure intended to reduce greenhouse gas emissions.

57.    Plaintiffs are public interest organizations committed to increasing the deployment of EVs and access to charging infrastructure. These efforts advance their organizational goals to mitigate climate change, reduce emissions of greenhouse gases, reduce harmful air pollution, improve air quality, advance equity, promote affordability, and realize the economic benefits of broad EV access—including community investment, job creation, and consumer savings.

58.    Plaintiffs worked to support the establishment of the CFI Program as part of the IIJA and have engaged with states and FHWA since the program's inception to promote and shape its implementation and maximize its effectiveness.

59.    Plaintiff Climate Solutions works to promote adoption of EVs and the build out of the EV charging network in the Pacific Northwest, and represents its volunteers, supporters, and

COMPLAINT OF
PUBLIC INTEREST ORGANIZATIONS
CASE NO. _____

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

funders in conducting that work. For example, Climate Solutions has sent letters of support for CFI grants for the Northwest Seaport Alliance and the tri-state fueling corridor. The CFI program freeze directly undermines the goals of Climate Solutions and its supporters, volunteers, and partners in promoting the transition away from conventionally-fueled vehicles.

60.     Plaintiffs have members who live, travel, or plan to travel in states across the country using EVs in Alternative Fuel Corridors ("AFCs") and in communities lacking adequate charging infrastructure, and who suffer economic, consumer, recreational, and health harms from Defendants' unlawful freeze of the CFI Program.

61.     Plaintiffs have members who would benefit from reduced air pollution and from improved mobility from the accessible infrastructure that Congress intended the CFI Program to provide. 23 U.S.C. § 151(a).

62.     Plaintiffs have members throughout the country whose ability to travel by EV, or ability to purchase and use EVs for travel and work, are adversely impacted and restricted by Defendants' freeze of the CFI Program and the resulting lack of new charging infrastructure that would otherwise be built to charge their EVs.

63.     For example, Judy Meyer is a member of NRDC. She lives on Lopez Island, Washington. She purchased an EV, a Hyundai Ioniq EV, and it is the primary vehicle for her household. Ms. Meyer has concerns about charging availability and infrastructure along highways, and charging infrastructure is a limiting factor for longer trips on highways like I-5 which is a FHWA-designated AFC. She would make longer drives with her EV if more reliable charging infrastructure was available. Ms. Meyer's daughter lives in Portland, Oregon, and she is frequently inconvenienced by the available public charging networks on this trip from Lopez Island to Portland. The available chargers along I-5 are frequently miles off of her route and in

COMPLAINT OF
PUBLIC INTEREST ORGANIZATIONS
CASE NO. _____

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA 98104*
*(206) 343-7340*

1   inconvenient areas, such as near unfamiliar shopping centers. For long trips that include the route

2   between Tacoma and Southern Washington, there is a near complete absence of EV chargers.

3   Due to the unavailability of charging infrastructure, she encounters difficulty planning routes,

4   finding chargers, and waiting for available chargers. At multiple points during longer trips, she

5   has had close calls where she thought she would run out of charge.  As a result of Defendants'

6   failure to disperse funds under the CFI program, Ms. Meyer is unable to benefit from a network

7   of reliable EV charging infrastructure.

8        64.    Also for example, Sierra Club member Lynn Beach lives in DeKalb County,

9   Georgia. Due to the limited charging options in Georgia, Ms. Beach experiences range anxiety,

10  and she has nearly run out of charge on multiple occasions when driving her Hyundai Ioniq 5 EV

11  around Atlanta and to visit her daughter in Athens, Georgia. If the proposed CFI grants awarded

12  to DeKalb County, the Athens-Clarke County Unified Government, and the Middle Georgia

13  Regional Commission move forward, it would be more convenient for Ms. Beach to charge her

14  car on trips and as part of her normal routine and she would be less concerned about getting

15  stranded with a dead battery. With the CFI program frozen, Ms. Beach has to use her gasoline-

16  powered car instead of her nicer and more cost-effective EV, which she prefers to drive.

17       65.    Also for example, Sierra Club member Michael Berkowitz lives in Ann Arbor,

18  Michigan and drives a Tesla Model 3. Mr. Berkowitz has often had trouble charging his EV

19  outside his home and he experiences range anxiety as a result. The current lack of charging

20  infrastructure in Michigan and across the country prevents Mr. Berkowitz from driving his EV to

21  places he would otherwise like to visit by car. The freeze of the CFI program harms Mr.

22  Berkowitz because it halts the construction of planned new chargers in Ann Arbor, Lansing,

23

24  COMPLAINT OF
    PUBLIC INTEREST ORGANIZATIONS
    CASE NO. _____

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

Detroit, and Grand Rapids, that would otherwise make it easier and less stressful for Michael to drive his EV around town and for work trips.

66.     Also for example, Sierra Club member Karl Bloss lives in Muskegon, Michigan and owns a Kia Niro EV, a Tesla Model Y, and a Zero Electric motorcycle. He and his family drive an EV to Grand Rapids almost weekly, and because there are so few chargers there, they often have to wait for one to become available. The CFI program freeze threatens planned chargers in Grand Rapids and elsewhere, harming Mr. Bloss, who would otherwise save time and energy on planning and have more flexibility to take his EV to places that do not currently have enough charging infrastructure.

67.     Also for example, Sierra Club and NRDC member Lisa Brenskelle lives in Houston, Texas and owns a Chevrolet Bolt EV. She does not have a Level 2 charger at home and primarily relies on trickle charging, but she sometimes needs to use a fast charger and has to wait for one to become available, due to the limited charging options in Houston. If the planned CFI program chargers in Houston and across the country are built, Ms. Brenskelle would have more options and would be able to choose to charge in more pleasant locations like local parks. The CFI program freeze harms Ms. Brenskelle by depriving her of these benefits.

68.     Also for example, Sierra Club member John Burr lives in Jacksonville, Florida, and drives a Tesla Model Y. The freeze on CFI funding jeopardizes the CFI program chargers planned to be built at the University Park Branch Library near his home in Jacksonville. Similarly, the funding freeze impairs the expansion of charging infrastructure in states along the East Coast that would otherwise alleviate the range anxiety he experiences when he drives from Florida to his second home in Maine and to other states in New England to visit family.

COMPLAINT OF
PUBLIC INTEREST ORGANIZATIONS
CASE NO. _____

- 19 -

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

69.     Also for example, Sierra Club member David Cortez lives in Austin, Texas and drives a Chevrolet Blazer EV.  He previously drove a Nissan Leaf and Chevrolet Bolt, and he had to purchase the more expensive Blazer for the longer range due in part to the lack of charging infrastructure. The lack of EV chargers in Houston and Austin inconveniences Mr. Cortez, especially when he uses his EV for rapid response efforts during power outages in communities with no public chargers. The CFI program freeze harms Mr. Cortez by threatening planned chargers in Houston and Austin that would make charging his EV more convenient during those efforts and in his day-to-day driving.

70.     Also for example, Sierra Club member Howard Dash lives in Las Cruces, New Mexico, and drives a Tesla Model 3. He takes his Tesla to El Paso, Texas multiple times per month, and the chargers he normally uses in El Paso are currently obstructed due to a long-term construction project. The planned chargers under El Paso's CFI grant would give Mr. Dash more convenient options to charge his EV while in El Paso, which would make him feel more comfortable driving his EV to El Paso even on days when it is lower on charge or when he has to go to the far side of the city. Mr. Dash would also benefit from the planned chargers under the grants awarded to the Town of Taos and County of Santa Fe, because they would enable him to visit Taos, which he currently does not visit due to the lack of convenient EV charging in Taos and on the route there through Santa Fe County. The freeze of the CFI program harms Mr. Dash because without the additional chargers, he will continue to be inconvenienced by the lack of accessible charging infrastructure in Texas and New Mexico.

71.     Also for example, Sierra Club member Harold Draper lives in Kansas City, Missouri, and often encounters issues charging his Chevy Bolt EV on longer trips in Missouri. He travels to St. Louis and Columbia once a year, and to the Ozarks every few years, and he

COMPLAINT OF
PUBLIC INTEREST ORGANIZATIONS
CASE NO. _____

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

typically has to drive his wife's gasoline-powered vehicle rather than his Bolt due to the lack of reliable charging infrastructure on his routes. Mr. Draper would prefer to drive his Bolt for the driving experience, environmental benefits, and lower cost. If they existed, he would use the chargers that would be built under CFI grants in Columbia, University City, and Kansas City, Missouri to enable him to take his Bolt on longer trips; accordingly, the freeze of the CFI program harms Mr. Draper.

72.     Also for example, Sierra Club member Alice Gray Read lives in South Miami, Florida. She drives a Nissan Leaf with about 30 miles of range and has experienced issues meeting her charging needs due to the poor availability and quality of EV chargers in Miami-Dade County. The chargers planned under Miami-Dade County's CFI grant would enable Ms. Gray Read to drive her Leaf further and avoid long, tedious efforts to track down charging, but the CFI program freeze deprives her of these benefits.

73.     Also for example, Sierra Club member Christine Hallquist lives in Burlington, Vermont and drives a Chevrolet Bolt EUV. She relies on public chargers in Burlington to charge her EV, which can be inconvenient due to the lack of fast chargers and inconsistent pricing of existing chargers. She also experiences range anxiety due to the lack of charging infrastructure in Vermont generally. The CFI program freeze harms Ms. Hallquist by halting the build-out of planned chargers in Burlington and thwarting EV infrastructure expansion in Vermont and other states that would alleviate Christine's anxiety and make it more convenient for her to charge her EV.

74.     Also for example, Sierra Club member David Hastings lives in Gainesville, Florida and owns a Chevrolet Bolt EV. He regularly visits several locations in Gainesville where chargers would be built under the CFI program, including the Martin Luther King Jr.

COMPLAINT OF
PUBLIC INTEREST ORGANIZATIONS
CASE NO. _____

- 21 -

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

Multipurpose Center, Sweetwater Wetlands Park, the Butler Plaza Transit Station, and the Gainesville City Hall, among other locations. If more charging infrastructure was built out in Gainesville and surrounding areas, it would be more comfortable and convenient for Mr. Hastings to drive his Bolt around Gainesville and to surrounding cities and states, which would help resolve the range anxiety that he and his wife currently experience due to the lack of chargers that the CFI program would provide.

75.     Also for example, Sierra Club member Tim Pingelton lives in Columbia, Missouri and drives a Hyundai Ioniq 6 EV. He experiences a lot of range anxiety because charging infrastructure is sparse in Missouri. The freeze of the CFI program harms Mr. Pingelton because it deprives him of the opportunity to use the chargers that would otherwise be built in downtown Columbia or in Kansas City when he visits his daughter, which would improve his quality of life and minimize his range anxiety.

76.     Also for example, Sierra Club member Gloria Randall-Hewitt lives in Racine, Wisconsin and owns a 2024 Hyundai Ioniq 6 EV. Due to the lack of EV charging infrastructure, she and her husband find it frustrating and scary to travel longer distances in their EV and often have to take their other car, a plug-in Toyota Prius hybrid, on longer trips for peace of mind. The CFI program freeze has prevented grants in Milwaukee and Dane County from moving forward, which harms Ms. Randall-Hewitt because she remains unable to drive her EV on longer trips and she visits Milwaukee and Madison less frequently than she would if the chargers are built.

77.     Also for example, Sierra Club member Rebecca Reimbold lives in South Bend, Indiana. She bought a used Nissan Leaf in 2023 with the expectation that federal programs to expand EV charging infrastructure, like the CFI program, would move forward. The Michigan Area Council of Governments received a CFI grant to build chargers in locations like Walkerton,

COMPLAINT OF
PUBLIC INTEREST ORGANIZATIONS
CASE NO. _____

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

North Liberty, and Plymouth—all along the Ms. Reimbold's route to her parents' house in North Judson. Ms. Reimbold would use these chargers on trips to visit her parents in her Leaf. However, the freeze of the CFI program has made her Leaf less valuable than it otherwise would be, and impairs her mobility, given the Leaf's limited range and the current lack of charger availability in South Bend and the surrounding area.

78.     Also for example, Sierra Club member Rhonda Rhoff lives part-time in Broward County, Florida. She owns a plug-in hybrid Chrysler Pacifica, and she prefers to drive using its electric motor to avoid contributing to air pollution. The proposed expansion of charging infrastructure in Broward County, Hollywood, Gainesville, and on the Seminole Tribe Reservation under the CFI program would make it safer and more convenient for Ms. Rhoff to utilize the electric motor in her plug-in hybrid, and the CFI program freeze deprives her of these benefits.

79.     Also for example, Sierra Club member Charles Ross lives in Gainesville, Florida, and he and his wife have been driving EVs since 2012. He has had problems finding functioning and available EV charging stations in Gainesville and surrounding areas, and new chargers at the sites selected in Gainesville under the CFI program would help, as Mr. Ross regularly visits those locations and it would save him time and worry to be able to charge his car there. However, the CFI program freeze deprives him of those benefits.

80.     Also for example, Sierra Club member Tasneem Sharmeen lives in Indianapolis, Indiana and drives a Tesla Model 3. She and her husband take long road trips in their EV and have nearly run out of battery on several occasions due to the lack of charging infrastructure in Indiana and other states. She feels limited by the lack of available public chargers because she and her husband have to plan their road trip stops around where charging is available and are not

COMPLAINT OF
PUBLIC INTEREST ORGANIZATIONS
CASE NO. _____

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

able to take detours without worrying about how it would impact their ability to find charging and make it to their destination. The CFI program freeze harms Ms. Sharmeen by jeopardizing planned chargers under the grants awarded in Indiana and in other states she visits or travels through, including Illinois, Ohio, Pennsylvania, Connecticut, Michigan, Kentucky, Tennessee, and Georgia, that would otherwise alleviate her range anxiety and give her more flexibility on road trips.

81.    Also for example, Sierra Club member Tracy Staedter lives in Milwaukee, Wisconsin. She and her husband drive a Chevrolet Bolt EV and they have struggled to find functioning EV chargers in Milwaukee and other parts of Wisconsin. If the proposed chargers in Milwaukee and Dane County were built, Ms. Staedter's trips in the Bolt would be safer, more convenient, and less expensive, and she would feel more comfortable using the Bolt on road trips. The CFI program freeze deprives Ms. Staedter of these benefits.

82.    Also for example, Sierra Club member Susan Steinhauser lives in Broward County, Florida and owns a Kia Niro plug-in hybrid. Susan is often forced to use expensive gasoline instead of electricity when driving her Niro. The CFI program freeze harms Ms. Steinhauser by depriving her of the benefits she would derive from using the planned chargers under Broward County's CFI grant, which would allow her to use more electricity in place of gasoline and make her trips more convenient.

83.    Also for example, Sierra Club member Chad Stephens lives in Cleveland, Ohio. He regularly drives to locations around the state in a rented EV for work and personal travel, and plans to purchase his own EV next year and will rely exclusively on public chargers. He experiences range anxiety and difficulty charging in Cleveland and across Ohio. The CFI program freeze harms Mr. Stephens by preventing the build out of planned chargers under grants

COMPLAINT OF
PUBLIC INTEREST ORGANIZATIONS
CASE NO. _____

- 24 -

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

awarded to the Lucas County Transportation Improvement District, Southeast Ohio Public

Energy Council, Mid-Ohio Regional Planning Commission, City of Cleveland, and City of

Cincinnati, which would be located in places Mr. Stephens travels to regularly and would

alleviate his range anxiety and make EV travel easier.

84.    Also for example, Sierra Club member Mark Walters lives in Miami, Florida and

drives a Ford F-150 Lightning EV. Mr. Walters uses his EV several times per year to transport

gear for Sierra Club outings around Miami-Dade County, including to Everglades National Park

and Big Cypress National Preserve. The CFI program freeze threatens the chargers proposed

under Miami-Dade County's CFI grant, harming Mr. Walters, as it would otherwise be much

more convenient for him to charge his EV on these trips. One of the planned chargers is less than

a mile from Sierra Club's gear storage closet, another is on his route to Everglades National

Park, and another is on his route to Big Cypress National Preserve.

85.    Also for example, Dan Wendelin is a member of NRDC. He lives in Anchorage,

Kentucky, a suburb of Louisville. He purchased his first EV, a Ford Mustang Mach-E, in

February 2022, and his wife purchased an EV in December 2024. The EVs are the only vehicles

in his household. Mr. Wendelin regularly uses his EV for his daily commute as well as extended

trips on I-64, I-265, and I-71. These highways are all Alternative Fuel Corridors designated by

the Federal Highway Administration. Mr. Wendelin has historically chosen to rent or borrow an

internal combustion engine vehicle instead of driving his EV due to concerns about EV charging

infrastructure. Mr. Wendelin would benefit from the gaps in the existing EV charging

infrastructure being filled by additional EV charging infrastructure from grants from the CFI

program, which would allow for shorter wait times for EV chargers and more consistency and

certainly while route planning for longer trips.

COMPLAINT OF
PUBLIC INTEREST ORGANIZATIONS
CASE NO. _____

- 25 -

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA 98104*
*(206) 343-7340*

# CAUSES OF ACTION

## COUNT 1

### VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT -
### ACTION IN EXCESS OF STATUTORY AUTHORITY
### AND NOT IN ACCORDANCE WITH LAW

86.     Plaintiffs re-allege and incorporate by reference the allegations set forth in paragraphs 1-85.

87.     Each of the Defendants is an agency as defined in the Administrative Procedure Act. 5 U.S.C. § 551(1).

88.     Defendants have indefinitely prohibited the new obligations of CFI program funds, awards of new grants, and approval of new obligations of funds, pursuant to the Implementation Memo, the Guidance Directive and other implementing agency actions. Defendants' actions to indefinitely prohibit the new obligations, awards of new grants, and approval of new obligations of CFI funds are final agency actions reviewable under the APA.

89.     The Implementation Memo and Guidance Directive, pursuant to which Defendants have frozen the CFI Program and blocked or impounded appropriated funds thereunder, are also final agency actions reviewable under the APA.

90.     Under the APA, courts shall hold unlawful and set aside agency action "contrary to constitutional right, power, privilege, or immunity," "in excess of statutory jurisdiction, authority, or limitations," "not in accordance with law," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A)-(D).

91.     The IIJA directs that the USDOT "shall establish a grant program to award grants" for the purpose of carrying out specific activities to *support changes in the*

COMPLAINT OF
PUBLIC INTEREST ORGANIZATIONS
CASE NO. _____

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

- 26 -

*transportation sector that help achieve a reduction in greenhouse gas emissions* and improve the mobility of passenger and commercial vehicles that employ electric, hydrogen fuel cell, propane, and natural gas fueling technologies across the United States" through the "acquisition and installation of publicly accessible electric vehicle charging infrastructure, hydrogen fueling infrastructure, propane fueling infrastructure, or natural gas fueling infrastructure that is directly related to the charging or fueling of a vehicle." 23 U.S.C. § 151(a), (f)(2), (f)(6) (emphasis added).

92.     The funds authorized for appropriation are specifically delineated in set amounts for specific fiscal years in order to "carry out" the CFI Program. Pub. L. 117–58, § 1101(b)(1)(C), 135 Stat. 429, 445 (2021).

93.     Congress has explicitly stated that "no part of any sums" appropriated for Federal-aid highway projects such as the CFI Program and apportioned for those programs may be "impounded or withheld from obligation." 23 U.S.C. § 101(c).

94.     All projects pursuant to the CFI Program are treated as a project on a Federal-aid highway. 23 U.S.C. § 151(f)(9)(A).

95.     Since January 20, 2025, the FHWA has ceased awarding new grants under the CFI program.

96.     Since January 20, 2025, the FHWA has ceased executing new grant contracts for announced awardees under the CFI Program, and has ceased to agree to new obligations under prior existing contracts.

97.     Defendants have indicated in the Implementation Memo and Guidance Directive that they will not sign any new contracts or obligate any funding under existing grants for

COMPLAINT OF
PUBLIC INTEREST ORGANIZATIONS
CASE NO. _____

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

- 27 -

"climate change activities" or "EV charging infrastructure" or projects where statutory language includes "climate considerations."

98.     Congress's purpose in enacting the CFI Program, established in "Subtitle D-Climate Change" of the IIJA, was to "support changes in the transportation sector that help achieve a reduction in greenhouse gas emissions." Pub. L. No. 117–58, Section 11401.

99.     Therefore, Defendants' freezing of the CFI Program, including funding of electric vehicle charging infrastructure, is contrary to law.

100.    Neither the IIJA nor any other federal law or regulation authorizes Defendants—or any other executive agency or official—to categorically withhold or withdraw CFI Program funds. Federal law specifically prohibits Defendants from withholding CFI Program funds that have been apportioned to a grantee.

101.    By prohibiting all expenditure of CFI Program funds not already obligated, the Defendants have categorically withdrawn and are withholding all CFI Program funds, contrary to the IIJA.

102.    Executive Branch policy priorities are not a lawful basis to withhold appropriated funds. *See City & County of San Francisco v. Trump*, 897 F.3d 1225, 1235 (9th Cir. 2018) ("Absent congressional authorization, the Administration may not redistribute or withhold properly appropriated funds in order to effectuate its own policy goals.").

103.    By prohibiting new obligations of CFI funds, Defendants are unlawfully prohibiting the expenditure of CFI funds that Congress has required the Executive to spend based on Executive Branch policy priorities that Congress did not enact as part of the CFI Program.

COMPLAINT OF
PUBLIC INTEREST ORGANIZATIONS
CASE NO. _____

- 28 -

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

104.    By refusing to award new grants, Defendants are unlawfully prohibiting the expenditure of CFI funds that Congress has required the Executive to spend based on Executive Branch policy priorities that Congress did not enact as part of the CFI Program.

105.    By declining to execute and by undermining the CFI program under the IIJA, Defendants violate the Take Care Clause.

106.    By indefinitely freezing congressionally appropriated funds based on factors outside the governing statutes and Defendants' congressionally delegated authority, Defendants violate the Constitution's separation of powers.

107.    Accordingly, Defendants acted in excess of their statutory authority and not in accordance with law by prohibiting the expenditure of all CFI Program appropriations not already obligated and by refusing to award new grants or approve new obligations of funds, in violation of the APA.

## COUNT 2

### VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT - ARBITRARY AND CAPRICIOUS AGENCY ACTION

108.    Plaintiffs re-allege and incorporate by reference the allegations set forth in paragraphs 1-107.

109.    Under the APA, courts shall "hold unlawful and set aside agency action" found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

110.    Agency action is arbitrary and capricious if the agency fails to act reasonably or provide a reasonable basis for its actions; relies on factors Congress did not intend it to consider; ignores important aspects of the issue; or fails to consider reasonable alternatives. It is likewise

COMPLAINT OF
PUBLIC INTEREST ORGANIZATIONS
CASE NO. _____

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

- 29 -

arbitrary and capricious for an agency to depart from prior policy without acknowledging the change, addressing legitimate reliance interests, or justifying the new policy with sound reasons consistent with the governing statute.

111.    For at least four reasons, Defendants' actions to freeze the CFI Program were arbitrary and capricious and must be set aside.

112.    First, Defendants failed to provide a reasoned explanation for their actions, including a departure from prior agency determinations. Specifically:

    1.    Defendants failed to support their actions with facts;

    2.    Defendants disregarded the factual record and circumstances that supported their previous determinations acknowledging and approving CFI grants; and

    3.    Defendants' unexplained actions and policy reversal, unsupported by fact or law, violate the requirement that agency action be the product of reasoned decision-making under the APA.

113.    Second, Defendants froze the CFI Program for the sole, and therefore impermissible, purpose of implementing Executive Branch policy decisions in direct contravention of the express policy decisions made by Congress and reflected in the statutory language Congress enacted to create the CFI program. *See* Pub. L. No. 117–58, Section 11401 (CFI Program is to "support changes in the transportation sector that help achieve a reduction in greenhouse gas emissions and improve [] mobility" by "strategically deploy[ing] publicly accessible electric vehicle charging infrastructure, hydrogen fueling infrastructure, propane fueling infrastructure, and natural gas fueling infrastructure"); *see also* 23 U.S.C. § 151(a) (same).

COMPLAINT OF
PUBLIC INTEREST ORGANIZATIONS
CASE NO. _____

- 30 -

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

114.    Third, Defendants' actions rely on factors that Congress neither intended nor authorized them to consider. Specifically, Defendants' actions freezing grant obligations under the CFI Program are based solely on Executive Branch policy preferences.

115.    Defendants' actions are contrary to Congress's specific directives and purposes for appropriating funds for the CFI Program in the IIJA.

116.    Fourth, Defendants froze the CFI Program without consideration of reasonable and lawful alternatives.

117.    Defendants' actions must be vacated as arbitrary and capricious under the APA. 5 U.S.C. § 706(2)(A).

## COUNT 3

### VIOLATION OF SEPARATION OF POWERS

118.    Plaintiffs re-allege and incorporate by reference the allegations set forth in paragraphs 1-117.

119.    "[W]henever a separation-of-powers violation occurs, any aggrieved party with standing may file a constitutional challenge." *Collins v. Yellen*, 594 U.S. 220, 245 (2021).

120.    The President of the United States has only those powers conferred on him by Article II of the Constitution and federal statutes.

121.    The U.S. Constitution grants Congress, not the President, exclusive power of the purse and the power to legislate. U.S. Const. art. I §§ 1, 8, 9.

122.    Neither the President nor any Executive Branch official has constitutional power to unilaterally amend federal statutes. Neither the President nor any Executive Branch official has constitutional power to unilaterally block, delay, or otherwise freeze the distribution of funds

COMPLAINT OF
PUBLIC INTEREST ORGANIZATIONS
CASE NO. _____

- 31 -

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA 98104*
*(206) 343-7340*

appropriated by Congress for particular purposes, particularly when the freeze is based on

Executive Branch policies rather than Congress's clear spending directives.

123.    In creating the CFI Program, Congress provided a clear mandate to USDOT to

expend specific sums of money in specific fiscal years for specific statutory purposes: to reduce

greenhouse gas emissions and address climate change by building out vehicle charging and

alternative fueling infrastructure. *See, e.g.*, Pub. L. 117–58, § 11101(b)(1)(C), 135 Stat. 429, 445

(2021); 23 U.S.C. § 151(a).

124.    Defendants have a constitutional obligation to implement the CFI Program by

distributing the congressionally appropriated funds to projects that help build out vehicle

charging and alternative fueling infrastructure within the specified fiscal years.

125.    Congress has not delegated to Defendants the authority to categorically prohibit

new obligations of CFI funds and has specifically prohibited Defendants from impounding any

CFI grant funds that have been apportioned to grantees.

126.    By freezing the CFI Program, USDOT and FHWA are thus contravening

Congress's directives, in violation of the Constitution's separation of powers.

127.    By basing the freeze of the CFI Program on directives that require the agency to

cancel all funding on climate change activities and EV charging infrastructure, the executive

branch seeks to supplant Congress's spending priorities with its own, in violation of the

Constitution's separation of powers.

128.    By indefinitely freezing congressionally appropriated funds whose availability is

time-limited, Defendants seek to effectuate an unauthorized impoundment of those funds.

129.    By indefinitely freezing congressionally appropriated funds based on factors

outside the governing statutes and Defendants' congressionally delegated authority, Defendants

COMPLAINT OF
PUBLIC INTEREST ORGANIZATIONS
CASE NO. _____

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

1    effectively seek to exercise the power of the purse and amend duly enacted appropriations laws,

2    in violation of the Constitution's separation of powers.

3                                        **COUNT 4**

4                        **VIOLATION OF THE "TAKE CARE" CLAUSE**

5         130.    Plaintiff re-alleges and incorporates by reference the allegations set forth in

6    paragraphs 1-129.

7         131.    The President and the Executive Branch have a duty under the Constitution to

8    "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3.

9         132.    When Congress appropriates funds for a specific purpose, the Executive has a

10   duty to distribute those funds to further the purpose directed by Congress.

11        133.    The Executive violates the Take Care Clause when it directs federal officers or

12   agencies to act in derogation of a federal statute.

13        134.    The Executive also violates the Take Care Clause when it declines to execute or

14   undermines statutes enacted by Congress and signed into law.

15        135.    Through the IIJA, Congress explicitly requires Defendants to distribute funding to

16   electric vehicle charging and alternative fueling projects that meet certain requirements in the

17   amounts and during the periods set out in the statutes directing the appropriations.

18        136.    The IIJA makes clear that funding directed to CFI grant projects shall be treated

19   the same as funding for Federal-aid highway projects. Congress has prohibited Defendants from

20   withholding from obligation or impounding "part of any sums" of such funding that has already

21   been apportioned. 23 U.S.C. § 101(c).

22

23

24   COMPLAINT OF
     PUBLIC INTEREST ORGANIZATIONS
     CASE NO. _____

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

                                        - 33 -

137.    By indefinitely freezing congressionally appropriated funds, Defendants frustrate Congress's will in appropriating those funds for specific fiscal years, and Congress's intention for those funds to be obligated during definite time periods.

138.    By indefinitely freezing the CFI Program, Defendants have thus acted contrary to, and in violation of, the Executive's Constitutional duty to take care that the laws be faithfully executed.

**COUNT 5**

**ULTRA VIRES ACTION**

139.    Plaintiffs re-allege and incorporate by reference the allegations set forth in paragraphs 1-138.

140.    Plaintiffs have a non-statutory right to have official action that is *ultra vires* declared unlawful.

141.    An agency or executive officer acts *ultra vires* when it acts in excess of its delegated powers or violates a specific statutory command.

142.    Judicial relief is generally available to anyone harmed by a government official's action taken beyond their express or implied legal authority.

143.    Defendants' actions are *ultra vires* because no law, including the IIJA, authorizes Defendants—or any other executive agency or official—to categorically and indefinitely freeze the obligation of all funding appropriated for grants under the CFI Program.

144.    Additionally, Defendants' actions are *ultra vires* because the withdrawal and withholding of CFI grant funds violates a clear and mandatory statutory directive to obligate all

COMPLAINT OF
PUBLIC INTEREST ORGANIZATIONS
CASE NO. _____

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

1   appropriated and apportioned CFI funds to effectuate the purposes set forth in the statute creating

2   the CFI Program.

3       145.    Defendants therefore acted in excess of the authority delegated by Congress and

4   in direct violation of specific statutory commands, and no reasonable interpretation of law

5   authorizes their actions.

COMPLAINT OF
PUBLIC INTEREST ORGANIZATIONS
CASE NO. _____

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

1

**PRAYER FOR RELIEF**

2    WHEREFORE, for all the reasons set forth above, Plaintiff respectfully requests this Court:

3    a) Declare that the freezing of the CFI Program by Defendants is unlawful;

4    b) Enjoin Defendants from continuing to freeze the CFI Program;

5    c) Vacate Defendants' actions to freeze the CFI program, including the Implementation

6    Memo and Guidance Directive;

7    d) Enjoin Defendants from implementing, giving effect to, or reinstating under a different

8    name or through other means the directives in the Unleashing EO or OMB Directive to

9    block implementation of the CFI Program;

10    e) Order Defendants to resume the implementation of the CFI Program, including

11    obligations of CFI Program funds for Fiscal Years 2022-2026 and awarding new grants

12    under the CFI Program for Fiscal Year 2026;

13    f) Enjoin Defendants from prohibiting new obligations of, and from otherwise impeding,

14    blocking, cancelling, or terminating, the distribution of CFI Program funds, through

15    action or inaction;

16    g) Order Defendants to provide regular status updates regarding the CFI Program,

17    including the availability, obligation, and use of appropriated funds;

18    h) Retain jurisdiction to ensure compliance with the orders of this Court;

19    i) Award Plaintiff their reasonable fees, costs, and expenses, including attorneys' fees

20    pursuant to 28 U.S.C. § 2412; and

21    j) Grant such other and further relief as the Court deems just and proper.

22

23

24    COMPLAINT OF
PUBLIC INTEREST ORGANIZATIONS
CASE NO. _____

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

DATED this 16th day of December 2025

Respectfully submitted,

 _s/ Jan E. Hasselman_
_s/ Marvin Brown IV_

JAN E. HASSELMAN, WSBA #29017
Earthjustice
810 Third Avenue, Suite 610
Seattle, WA 98104
Tel: (206) 343-7340
jhasselman@earthjustice.org

MARVIN C. BROWN IV*
Earthjustice
1001 G St., NW, Ste. 1000
Washington, DC 20001
Tel: (202) 794-5355
mcbrown@earthjustice.org

_Counsel for Plaintiffs Climate Solutions
and Sierra Club_

_s/ Jennifer A. Sorenson_

JENNIFER A. SORENSON, WSBA
#60084
P.O. Box 31936
Seattle, WA 98103
Tel: (415) 361-9495
jen.sorenson@gmail.com

_Counsel for Plaintiff Natural Resources
Defense Council_

_s/ Joshua Stebbins_
_s/ Zachary Fabish_
_s/ Joya Manjur_

JOSHUA STEBBINS*
ZACHARY M. FABISH*
Sierra Club
50 F St. NW, 8th Floor
Washington, DC 20001
Tel: (202) 417-7176
Tel: (650) 388-8446
josh.stebbins@sierraclub.org
zachary.fabish@sierraclub.org

JOYA MANJUR*
Sierra Club
2101 Webster St. #1300
Oakland, CA 94612
Tel: (510) 221-6342
joya.manjur@sierraclub.org

_Counsel for Plaintiff Sierra Club_

COMPLAINT OF
PUBLIC INTEREST ORGANIZATIONS
CASE NO. _____

- 37 -

_Earthjustice_
_810 Third Ave., Suite 610_
_Seattle, WA 98104_
_(206) 343-7340_

1

*s/ Shampa Panda-Bryant*
*s/ Thomas Zimpleman*

2

SHAMPA PANDA-BRYANT*
THOMAS ZIMPLEMAN*

3

Natural Resources Defense Council
1152 15th Street NW, Suite 300

4

Washington, D.C. 20005

5

Tel: (202) 836-9333
Tel: (202) 289-6868

6

spanda-bryant@nrdc.org
tzimpleman@nrdc.org

7

8

*Counsel for Plaintiff Natural Resources*
*Defense Council*

9

*Pro Hac Vice Application Forthcoming*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

COMPLAINT OF
PUBLIC INTEREST ORGANIZATIONS
CASE NO. _____

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*